ance, is to be paid over to the state. The receipt of such property into the national treasury, we may presume, will be with views and dispositions suitable to the age and to our free institutions, rendering the whole law on this subject, in its administration by the United States, as the wise and benevolent would desire. Writers on the Law of Wreck occasionally quote Juvenal's sarcastic lines,

"Quicquid conspicuum, pulchrumque est æquore toto,
Res fisci est, ubicumque natat."

Whatever of such grasping spirit may have predominated, in times long past, or may have appertained to the claims of prerogative, no selfish or ungracious views belong to what is, in this case, conferred on the sovereign authority. I do not adopt the language of the English authorities, in this particular, without a degree of reluctance, that property found derelict on the seas is acquired beneficially for the sovereign, if no owner appear, provided it is to be understood, that such property becomes absolutely and irreclaimably vested in the sovereign, should no owner appear, within a year and a day from the time of the decree of salvage. It is more satisfactory to consider the sovereign authority as holding such property in trust, to be surrendered to reasonable claims which may be presented. The learned Vinnius, in stating the claims of the sovereign in cases of this description, informs us of the liberal practice in his own country after the legal time prescribed for the appearance of the owner has elapsed, and the money accruing from goods thus saved, deducting the allowance for salvage, is paid into the public treasury. "Hoc tempore elapso publicantur, et fisco acquisitae esse intelliguntur, qui tamen facile patitur eas redimi." In. quat. Lib. Inst. lib. ii. tit. 1.

This supplemental libel will be dismissed, and the requisite orders will be entered to transfer these proceeds, and other money remaining in the registry under similar circumstances, to the proper department of the government, on the principles and in the manner that have been indicated.

---

## Case No. 10,870.

### PEABODY v. UNITED STATES.

[See Case No. 10,869.]

---

PEABODY (VAN AMRINGE v.). See Case No. 16,825.

PEACO (UNITED STATES v.). See Case No. 16,018.

PEACOCK (UNITED STATES v.). See Case No. 16,019.

PEACOCK, The LOVETT. See Case No. 8,555.

## Case No. 10,871.

### PEACON et al. v. The AMAZON.[1]

District Court, S. D. Florida. April, 1872.

SALVAGE—COMPENSATION—MATERIALS SAVED
AFTER ABANDONMENT.

[1. Thirteen vessels, several of the smaller class, carrying 81 men, went to the assistance of a bark ashore on the Florida Reef. They did everything possible to get her afloat. but her bottom gave way. With peril to the salvor vessels, the cargo of 660 bales of cotton, and the materials and stores were taken out, and landed at Key Largo, and reshipped, the labor occupying 14 days, part of the time day and night without cessation. Held, that 35 per cent. on the net value of the cargo and 45 per cent. on the materials saved, after deducting usual costs, charges, and expenses, was a reasonable salvage.]

[2. For brass stripped from the bottom of a bark and other small articles of materials saved from a stranded vessel after the entire abandonment by both the master and original salvors, where the amount is small, 60 per cent. allowed.]

[This was a libel in rem by Benjamin Peacon and others against the cargo and materials of the Norwegian bark Amazon for salvage.]

LOCKE, District Judge. This vessel, laden with 660 bales of cotton, bound from Galveston to Liverpool, went ashore on the Florida Reef about 2 o'clock on the morning of the 14th of March, 1872, and 13 salving vessels, several of the smaller class, carrying 81 men, went to her assistance. When they first reached her she lay upon a rough, rocky bottom, upon an exposed portion of the reef, with the wind and sea directly abeam, and thumping heavily. They immediately proceeded to carry out an anchor and chain, and do everything that was possible to relieve her from the rocks, but while so engaged the vessel's bottom gave way, she immediately filled with water, and further exertions to get her afloat were abandoned, and the salvors at once proceeded to save cargo, materials, and stores. The distance from this port and the necessity of immediate action were so great, that they took a large portion of the cargo to Key Largo, a distance of seven miles, landed it, and continued to save other portions from the wreck, until all of the cotton, excepting three bales, together with all of the stores and materials, have been saved and brought to this port, leaving a loss out of the entire cargo of but three bales of cotton, and all saved in as good a condition as the circumstances of the case would possibly permit. On account of many of the vessels being small, and on that account unable to bring cargoes of cotton, great additional labor devolved upon the salvors in the landing and reshipping, and, as is alleged, they were occupied 14 days in the service, a portion of that time, until the property was saved

1 [Not previously reported.]